Argued November 30, 1970, affirmed February 18, 1971

In the Matter of the Estate of James Elbridge
Elliott, Deceased

THOM, *Respondent, v.* BAILEY et al,
*Petitioners.*

481 P2d 355

*William E. Hanzen,* Pendleton, argued the cause for petitioners. With him on the briefs were Isaminger & Hanzen, Pendleton, and George W. Roberts, Walla Walla, Washington.

*Robert W. Collins,* Pendleton, argued the cause for respondent. With him on the brief were Sherwood & Tugman, Walla Walla, Washington.

TONGUE, J.

This case involves three separate proceedings on behalf of plaintiff, an illegitimate child, to declare her to be the daughter of the decedent and, as such, entitled to inherit his entire estate. The first proceeding is a proceeding in probate for determination of heirship. The second is a petition in probate to revoke the probate of decedent's will. The third is a suit for declaratory judgment. All three were consolidated for trial.

Defendants, including decedent's mother, have petitioned for review of a decision by the Court of Ap-

peals, which affirmed a decree and orders in probate declaring, in substance, that James Elliott, an unmarried man, was the father of Meta Marie Thom, and that she is his sole heir and as such entitled to inherit his estate of some $100,000. 3 Or App 97, 471 P2d 809 (1970). Three questions are presented by this appeal: (1) Whether the Court of Appeals had jurisdiction to hear this appeal; (2) Whether plaintiff sustained her burden to prove that she was the child of decedent; and (3) Whether, under the terms of ORS 109.070 (adopted in 1957), the paternity of plaintiff, as an illegitimate child, by the decedent could be established for purposes of inheritance either by declaratory judgment proceedings or by proceedings for determination of heirship—a question of first impression in this court.

Because of the importance of these questions, particularly the third question, we granted defendant's petition for review.

1. *Jurisdiction of Court of Appeals.*

■ The Court of Appeals, by the terms of Oregon Laws 1969, ch 198, § 1, was granted jurisdiction of appeals and proceedings arising under ORS chapters 111 to 121, inclusive, all relating to the estates of decedents. Defendants point out, however, that by § 1 of that Act it was not granted jurisdiction to hear appeals in then-pending suits for declaratory judgments to determine who is entitled to inherit property from the estate of a decedent, including this case, for the reason that probate courts did not previously have jurisdiction to make declaratory judgments until granted such power later in 1969 by the new Probate Code (Oregon Laws 1969, ch 591) (ORS 111.005 et seq).

Since, however, the suit for declaratory judgment in this case not only involved the estate of a decedent, but was, by agreement of defendants, consolidated for trial with two probate proceedings over which the Court of Appeals clearly has jurisdiction, we hold that it had jurisdiction over the appeal of the entire consolidated case.

## 2. *Sufficiency of evidence to prove paternity.*

The trial court, as well as the Court of Appeals, held that plaintiff had sustained the burden of proof and found that she was the daughter of the decedent. After examining the entire record we agree that plaintiff offered sufficient evidence to support such a finding and that it was a proper finding under the evidence in this case.

It would serve no useful purpose to review all of the evidence in detail, as set forth in an able opinion by the trial court. Because of the importance of the case, however, as well as the novelty of the questions of law presented, we shall briefly summarize the facts.

In April 1953 James Elliott met Dorothy Thom in Walla Walla, Washington. At that time he was about 22 years of age, single, and she was about the same age, also single. On the night of April 11th (according to Dorothy Thom) they had a date, during which it is contended that plaintiff was conceived. Elliott, in a subsequent deposition, placed the date as April 18, 1953.

Some time later, upon finding that she was pregnant, Dorothy Thom filed an action for damages for alleged rape against Elliott in Walla Walla, Washington. She also filed filiation proceedings against him there.

Depositions were taken of both parties to the damage action. In these depositions she testified that she was forcefully ravished and he admitted having intercourse with her, but denied paternity. He claimed that although she did not resist his advances, the act of intercourse was not consummated by him. At that time Elliott hired a detective in an effort to produce evidence that Dorothy Thom had intercourse with other men during the period in question, but was not successful in producing any such evidence. Blood tests were also taken at his request, but were inconclusive.

A settlement was then agreed upon under which Elliott paid her $7,250 in return for a release of all claims, dated September 27, 1954. Both proceedings were then dismissed, with prejudice.

On December 29, 1953, plaintiff Meta Marie Thom was born at a hospital in Walla Walla. Based upon information supplied by her mother, Dorothy Thom, plaintiff's birth certificate left "blank" the name of her father, although her mother testified that she told her doctor that Elliott was the father. Plaintiff's custody was retained by her mother, who later married another man. At the time of the trial plaintiff was 15 years of age.

In November 1956 Elliott was married. He and his wife then attempted, without success, to have children. In December 1957 (over four years after the admitted act of intercourse) Elliott visited a doctor, who took a specimen of his semen. Upon examining it, no sperm was found. He then prescribed vitamins and gave hormone shots to Elliott. In 1961 Elliott was divorced. His wife later remarried and became the mother of three children.

James Elliott never remarried and died on

April 24, 1967. The cause of death was cancer of the testicles. His mother, Gladys Bailey, who had been named as the executrix of a will made prior to his divorce, then undertook to probate that will. These proceedings were then filed.

In these proceedings it is admitted that James Elliott died intestate. His mother contends, however, that she is his sole and only heir and is entitled to inherit all of his estate. She also denies that plaintiff is his daughter.

On trial of these consolidated proceedings, in addition to evidence of the facts already stated, plaintiff's mother again testified to the act of intercourse and fixed the date as April 11, 1953. She also denied having intercourse with any other man during the period in question, although admitting intercourse with two other men at other times, one in July 1953. She also admitted that she later considered a possible scheme (which she never actually attempted) to "hang" the paternity of the baby on one of these men.

Defendants then offered medical opinion testimony that although "possible," it was unlikely that plaintiff was conceived by intercourse on April 11, 1953, in view of the date of the last previous menstrual period of her mother on March 23, 1953 (according to the medical records), and the date of birth of the baby on December 29, 1953, although admitting some "variation" in such matters.

Defendants also offered testimony that James Elliott, when 10 or 12 years of age, had mumps in some unknown degree of seriousness. Defendant then offered the testimony of a general practicing physician that mumps in a boy of that age can cause sterility and that based upon that fact, together with the absence of sperm at the time of the subsequent test by the

same witness in December 1957, it was his opinion that James Elliott was sterile at the time of his admitted intercourse with plaintiff's mother in April 1953.

In reply, plaintiff called as witnesses a specialist in obstetrics and gynocology and a specialist in urology, who testified that the manner in which the test was made by defendant's witness in December 1957 was not reliable; that, in any event, the absence of sperm at that time may well have been the result of a temporary "blockage," which can result from various causes; that it thus did not necessarily follow that James Elliott was sterile in April 1953, at least without knowledge and consideration of additional facts, and that if he had been previously rendered sterile as the result of mumps, it would be expected that his mother would have been aware of that fact and that his testicles would have atrophied and would not later appear to be normal.

Defendant's witness admitted that at the time of his examination in December 1957, plaintiff's testicles appeared to be normal, but contended that they "do not necessarily shrink" when sterility is caused by mumps. No autopsy evidence was offered. Neither did defendant call as a witness the doctor who treated Elliott during his terminal illness, apparently because that doctor was also deceased.

While it may be that plaintiff's evidence did not establish the paternity of James Elliott beyond all reasonable doubt, we find that it was sufficient to establish that fact by a preponderance of the evidence, and even by "clear and convincing" evidence, if that test be required in such proceedings. As held by this court in *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958), the test of "clear and convincing evi-

dence" means that the truth of the facts asserted is "highly probable." In our opinion, the testimony of plaintiff's witnesses was sufficient to satisfy that test and we agree with the findings of the trial judge.

We have often said that the trial judge, based upon his observation of the witnesses and their demeanor, is in a far better position than this court to pass upon the credibility of witnesses. In this case, despite attacks upon the credibility of plaintiff's mother and other witnesses, an experienced trial judge, after listening to these witnesses and observing their demeanor, chose to accept them as credible witnesses and to believe their testimony on points of conflict with testimony of defendant's witnesses.

It is also important to note that the only intercourse engaged in by plaintiff's mother during the month before and after April 11, 1953, according to the evidence, was the act of intercourse admitted by James Elliott. Thus, as also admitted by one of defendant's medical experts, if these facts are true (and there is no evidence to the contrary) either that act by James Elliott was cause of the pregnancy resulting in plaintiff's birth, "or it was an immaculate conception."

3. *Statutory provisions for declaratory judgment and for determination of heirship as "other provisions of law" to establish the paternity of illegitimate children.*

(a) *History of prior legislation in Oregon on rights of illegitimate children.*

■ ORS 109.070, adopted in 1957, provides that the paternity of illegitimate children may be established for purposes of inheritance not only by four specific

methods as set forth in that section, but also "(5) By paternity being established or declared by other provision of law." The question to be decided is whether statutory provisions for suits for declaratory judgment (ORS 28.040) and for proceedings for determination of heirship (ORS 117.510) are "other provision(s) of law" by which the paternity of illegitimate children may be established for the purposes of ORS 109.070 (5).

Both the trial court and the Court of Appeals decided this question in the affirmative, without extended discussion. Because of the importance of the question, however, as one of first impression in this court, we shall review it in more detail.

At common law an illegitimate child was regarded as "a child of nobody" and could not be the heir of anyone.[1] This harsh rule, inflicting punishment upon children for the indiscretions of their parents by barring them from inheritance from their fathers was the rule in Oregon until 1957, with only slight amelioration.[2]

By statute adopted in 1864, it was originally provided in Oregon that "an illegitimate child shall be considered an heir of its mother and shall inherit and receive her property, * * *"[3] The same statute provided that "if after the birth of an illegitimate child, the parents thereof shall intermarry, such child shall be considered legitimate to all intents and purposes" and thus, in such an event, entitled to inherit from the father.

---

[1] State v. McDonald, 59 Or 520, 526, 117 P 281 (1911).

[2] Jauraguy and Love, Oregon Probate Practice, 26, § 18.

[3] Oregon Laws 1864, D p 676, § 4. See State v. Looney, 149 Or 287, 290, 40 P2d 735 (1935).

In 1889 that statute was amended to provide that "when the parents of such child have formally married, and have lived and cohabited as husband and wife, such child shall not be regarded as illegitimate within the meaning of this act, although such formal marriage shall be adjudged to be void."[4]

In 1917 a statute was adopted giving an illegitimate child the right to inherit from its father if, within three years after its birth, and while the father was still alive, its parentage was established by filiation proceedings.[5]

In 1925 it was provided by statute that if a man and woman "not otherwise married" shall have "cohabited in the state of Oregon as husband and wife for over a year" any living children were "declared to be legitimate offspring" of such a "marriage."[6] That statute, however, was repealed in 1929.[7]

In 1939 a statute declaring certain marriages to be void was amended by providing that children who were "the issue of such void marriages shall be deemed legitimate."[8]

In 1941 statutes relating to birth certificates were amended to authorize omission of any reference to the fact of illegitimacy and to forbid disclosure of that fact except upon court order, but no change was

[4] Oregon Laws 1889, p 75, § 1, later codified as ORS 111.220 and later repealed by Oregon Laws 1957, ch 411, § 7.

[5] Oregon Laws 1917, ch 48, § 14, later ORS 111.230, referring to filiation proceedings brought under ORS 109.110 to 109.230 or under ORS 109.130. ORS 111.230 was also later repealed by Oregon Laws 1957, ch 411, § 7.

[6] Oregon Laws 1925, ch 269. That statute was construed by this court in Wadsworth v. Brigham, 125 Or 428, 259 P 299, 266 P 875 (1928), as discussed below.

[7] Oregon Laws 1929, ch 149.

[8] Oregon Laws 1939, ch 163, § 1.

made in the limitations upon the rights of inheritance of such children.[9]

Thus, as of 1957 a child born out of wedlock still could not inherit from its father unless: (1) The parents were subsequently married; (2) The child was illegitimate only because the marriage of the parents was a void marriage; or (3) Parentage was established by filiation proceedings within three years from its birth.[10]

In thus imposing rigid restrictions upon inheritance of illegitimate children from their fathers, Oregon was not alone. Indeed, most states imposed similar restrictions, and still do, with the exception of Oregon, Arizona and North Dakota, to the indignation of authorities on the subject who object to "the continued prejudicial treatment of the innocent products of other's indiscretions."[11] It is still recognized, however, that the right of an individual to inherit from a decedent's estate is not a natural right, but one bestowed by law, and accordingly is subject to statutory authority.[12]

[9] Oregon Laws 1941, ch 77, § 1; Oregon Laws 1941, ch 130, § 19. (See ORS 432.205; ORS 432.415 and 432.420.)

[10] See ORS 111.220 and ORS 111.230, referring to proceedings under ORS 109.110 to 109.230 or 109.130.

[11] See 6 Powell on Real Property 685-6, § 1003 and N.D. Cent Code 356-01-05 (1969 Supp). See also Gray & Rudovsky, The Court Acknowledges the Illegitimate: Levy v. Louisiana and Glona v. American Guarantee & Liability Insurance Co., 118 U Pa L Rev 1 (1969); Krause, Legitimate and Illegitimate Offspring of Levy v. Louisiana—First Decisions on Equal Protection and Paternity, 36 U Chi L Rev 338 (1969).

It is also of interest to note that in Levy v. Louisiana, 391 US 68 at 72, note 6, 88 S Ct 1509, 20 L ed 2d 436 (1968), the court quoted as follows from Shakespeare, King Lear, Act I, Scene II:

"* * * When my dimensions are as well compact, My mind as generous, and my shape as true, As honest madam's issue? Why brand they us With Base? * * *"

[12] Bancroft, Probate Practice 549, § 1208.

(b) *Adoption of the act of 1957.*

In 1955 a bill was introduced in the Oregon Legislature with substantially the same provisions as now in effect, but was not enacted into law.[13]

In 1957, however, the Oregon Legislature enacted substantially the same act which, according to its sponsors, was intended "to modernize the law relating to children of unmarried parents."[14] Section 1 of the act (now ORS 109.060) provides:

"The legal status and legal relationships and the rights and obligations between a person and his descendants, and between a person and his parents, their descendants and kindred, are the same for all persons, whether or not the parents have been married."

It will be noted that the act avoids the use of the words "legitimate" and "illegitimate."

To the same effect as section 1, section 3 provided, in part:

"In applying the laws of descent and distribution of this state, full effect shall be given to all relationships as described in section 1 of this Act."[15]

[13] HB 405 (1955). That bill was supported by the Oregon State Bar, the Boys and Girls Aid Society of Oregon and by various Protestant church groups. It was opposed by the Archbishop of the Catholic Church as having a "tendency" to "break down the sanctity of the marriage" and to "disrupt and break down the dignity of the individual." Similarly, the committee minority opposed the bill upon the ground that it "would open up illicit relations in the state." (Minutes of House Judiciary Committee, March 10 and 15, 1955 and April 10, 1955.)

[14] See Oregon Laws 1957, ch 411, and Minutes of Senate Judiciary Committee, February 28, 1957, p 4.

[15] This section (ORS 111.231), was later repealed by Oregon Laws 1969, ch 591, § 28 and replaced by what is now ORS 112.105.

Similarly, section 6 (now ORS 109.090 (2)), provides:

"This Act shall be liberally construed, with the view of effectuating its objects, notwithstanding the rule of common law that statutes in derogation thereof are to be strictly construed."

Section 5 (now ORS 109.090 (1)), provides that the Act shall apply to all persons, whether born before or after the Act took effect.

In providing means for the establishment of paternity for the purposes of inheritance, the Act provides, by section 2 (now ORS 109.070):

"The paternity of a person may be established as follows:

"(1) The child of a wife cohabiting with her husband who is not impotent, shall be conclusively presumed to be the child of her husband, whether or not the marriage of the husband and wife may be void.

"(2) A child born in wedlock, there being no decree of separation from bed or board, shall be presumed to be the child of the mother's husband, whether or not the marriage of the husband and wife may be void. This shall be a disputable presumption.

"(3) By marriage of the parents of a child after his birth.

"(4) By filiation proceedings as provided in ORS 109.110 to 109.240.[10]

"(5) *By paternity being established or declared by other provision of law.*" (Emphasis added)

---

[10] ORS 109.110 et seq, providing for filiation proceedings, were repealed by the new Probate Code, Oregon Laws 1969, ch 619, § 15, and replaced by ORS 109.125 et seq. Accordingly, ORS 109.070(4) was also amended in 1969 to read "By filiation proceedings." See Oregon Laws 1969, ch 619, § 11.

Again, it is to be noted that the statute is not limited to proof of paternity of illegitimate children, but uses the term "paternity of a person" and applies both to legitimate children, born in wedlock, and to illegitimate children, born out of wedlock.

Section 3 of the Act of 1957 also provided that before the relationship of father and child could be given effect in determining inheritance rights, "heirship must be established prior to the closing of the administration of the decedent's estate or, if the decedent's estate is not administered in this or any other state, then within three years after the decedent's death."[16] Thus, no right to real property vested if the heirs were children, whether or not born in wedlock, unless the fact of paternity by decedent was first "established."[17]

In considering the intent and effect to be given to the Act of 1957 it is to be noted again that under the terms of sections 1 and 2 (ORS 109.060 and 109.070, which provide the methods by which "the paternity of a person may be established," and "for all persons, whether or not the parents have been married") the method of establishing the paternity of children born in wedlock is by the application of pre-

---

[16] See note 15.

[17] Cf Jauraguy and Love, *supra* note 2, at 29. Section 3 of the Act was amended in 1969, however, upon the adoption of Oregon's new Probate Code, to provide that for the purposes of intestate succession, and for such purposes only, before the relationship of father and child shall be given effect paternity must be established under ORS 109.070 during the lifetime of the *child*, except where the father had "acknowledged himself to be the father in writing signed by him during the lifetime of the child." (Oregon Laws 1969, ch 591, § 28; ORS 112.105) A somewhat similar provision had been included as section 2(5) in HB 403 (1955), which was the predecessor of Oregon Laws 1957, ch 411 but had later been deleted by amendment on April 22, 1955.

sumptions (section 2, subsections (1) and (2), ORS 109.070 (1) and (2)). By contrast, the method of establishing the paternity of children born out of wedlock, for the purposes of the Act, is either by the subsequent marriage of the parents or by filiation proceedings (section 2, subsections (3) and (4), ORS 109.070 (3) and (4)).[10]

Subsection (5) of section 2, however, (ORS 109.070 (5)) does not, by its terms, apply specifically to either children born in or out of wedlock (i.e., legitimate or illegitimate children). Thus, in keeping with the legislative purpose to treat all such "persons" the same, subsection (5) is subject to interpretation to mean that, in addition to the methods provided by subsections (1) to (4) for establishing paternity, the paternity of both legitimate and illegitimate children can also be "established or declared" by "other provision(s) of law."

It is also significant to note that by subsection (5) (ORS 109.070 (5)) the legislature did not say that paternity may be established by "other provisions of law providing for the establishment of paternity of persons born out of wedlock for purpose of inheritance"; but provided that "The paternity of a person may be established * * * (5). By paternity being established or declared by other provisions of law." Thus, it may be contended that subsection (5) was not limited to then-existing statutory provisions for the specific purpose of establishing paternity of illegitimate children for purposes of inheritance, but was intended to apply to any then-existing general statutory

---

[10] By Oregon Laws 1969, ch 591, § 28. (ORS 112.105) a further method is provided in that paternity can also be established by written acknowledgment by the father during the lifetime of the child.

remedy which could properly be used to establish the paternity of either legitimate or illegitimate persons, and for any purpose.

Thus, we come to the crucial issue to be decided in this case—whether either statutory provisions for declaratory judgment or for determination of heirship are "provision(s) of law" by which paternity can properly be established for children born either in or out of wedlock and for any purpose. If so, the decision of the trial court and Court of Appeals must be affirmed. If not, these decisions must be reversed.

(c) *Contentions of parties.*

Plaintiff contends that both the statutory provisions for declaratory judgments (ORS 28.010 to 28.130) and the statutory provisions for determination of heirship (ORS 117.510 to 117.560) are "other provision(s) of law" by which paternity may be established, and that such a result is not only required by the terms of the Act of 1957, but is consistent with its purpose to "modernize the law" by granting to illegitimate children the same rights as other children.

Defendants' vigorous contentions to the contrary may be summarized as follows:

(1) *Contention that in order for an illegitimate child to inherit from its father the paternity of the child must first be established in one of the methods provided by ORS 109.070.* This, of course, is conceded.

(2) *Contention that ORS 109.070 (5) did not authorize paternity to be established by any means other than those already existing and expressly recognized in ORS 109.070 (1) to (4) inclusive, and that, on the contrary, subsection (5) was merely a "typical catchall provision, which preserved other ways of establishing*

paternity, if any other laws exist," but had no effect whatever because there were no other statutory provisions for establishing paternity other than those expressly recognized in subsections (1) to (4).

In support of this contention defendants refer to a statement made by one of the sponsors of the Act of 1957 at a legislative committee hearing on the Act to the effect that section 2 (ORS 109.070) "covers matters of proof of paternity and involves no change in existing law as to how paternity may be proven."[29]

This, of course, begs the entire question. Thus, it is conceded that subsection (5) must refer to other existing provisions of law by which paternity, "may be established." The issue, however, is whether subsection (5) was intended to be limited to existing provisions by which paternity of *illegitimate* children may be established *for purpose of inheritance*, or was intended to extend to other statutory provisions by which paternity of either legitimate or illegitimate children might be established for any purpose.

Furthermore, the effect of defendants' contention would render subsection (5) completely meaningless, as conceded by defendants, and despite the fact that defendants' also concede the generally recognized rule of statutory construction to be that the court may not "cast aside language of a law as meaningless if it is reasonably possible to give it effect," citing *Blyth & Co., Inc. v. City of Portland*, 204 Or 153, 159, 282 P2d 363 (1955).

After examining the entire statute and its legislative history, in the light of the statutory restrictions previously imposed upon the proof of paternity by

[29] Minutes of Senate Judiciary Committee, February 28, 1957, p 4.

illegitimate children and the expressed purpose of the Act of 1957 to confer the same "legal status and legal relations and rights and obligations" between illegitimate children and their parents as between other children and their parents and to give "full effect" to all such relationships, as well as the expressed intent that the Act shall be "liberally construed, with a view of effectuating its objects," we hold that to construe ORS 109.070 (5) as having no effect whatever, as contended by defendants, would be contrary to the very rule of statutory construction conceded by defendants.

On the contrary, and for the same reasons, we believe that it is most "reasonably possible" (to quote defendants) to give effect to ORS 109.070 (5) by holding that it was intended to and did, by its terms, provide that illegitimate, as well as legitimate, children may establish paternity for all purposes, including inheritance, under any "other provision of law" by which paternity could properly be established or declared by any person for any purpose.

(3) *Contention that statutory provisions for declaratory judgments and for determination of heirship are not "other provision(s) of law" by which paternity may be "established or declared" because they do not establish requirements for proof of paternity, but are "procedural" in nature, because they "assume some independent basis for the rights to be declared or determined" and also because "none of these statutes prescribe the evidence required to establish paternity."*

In support of this contention defendants urge that at the time of adoption of the Act of 1957 the various statutes existing at that time to establish the paternity of illegitimate children restricted the kind of proof required for that purpose because of the

danger of fraudulent claims of paternity. Thus, defendants contend that for these same reasons the legislature, in enacting ORS 109.070, including subsection (5), must have intended to permit paternity to be established only under statutes which restricted the manner of such proof, and that to hold otherwise would be "to render ORS 109.070 meaningless" and would "remove the safeguards of proof" and "allow a living woman to swear paternity of her illegitimate offspring on a dead man," all without corroboration or right to jury trial, as required in filiation proceedings. Defendants also point out that the statutes and court decisions of most other states are in accord with this contention, based upon the same policy considerations, and that there are no previous Oregon decisions to the contrary.[21]

Since, however, the legislature enacted the Act of 1957 "to modernize the law relating to children of unmarried parents,"[22] it follows that the statutes of other states with different provisions and decisions of the courts of other states under such statutes are not in point. For the same reason, neither the fact that the previous Oregon statutes imposed strict limitations upon proof of paternity, nor the fact that no previous decisions by this court had held to the contrary is controlling, since most of the previous Oregon statutes

---

[21] Defendants also contend that for the courts to permit paternity to be established under statutory provisions for declaratory judgments and for determination of heirship, without statutory provisions presenting the "ground rules by which paternity can be established" in such proceedings would constitute an "unlawful delegation of power." Since, however, proceedings under statutory provisions for declaratory judgments and for determination of heirship are required to conform to established standards of proof in such statutory proceedings, such a result would not constitute an unlawful "delegation of power."

[22] See note 14, *supra*.

on the subject of paternity were repealed by the Act of 1957.[29]

While the danger of fraudulent claims by illegitimate children and their mothers against the estates of dead men is a valid and important consideration of public policy, the injustice of imposing restrictions upon the proof of paternity by innocent children because of the indiscretions of their parents is also a valid and important consideration of public policy. It was the duty of the legislature in adopting the Act of 1957 to consider and weigh these conflicting considerations of public policy. It is the duty of this court to give effect to the provisions of the Act of 1957, as adopted by the legislature, as best this court can determine the intent and meaning of the provisions of that Act.

As we read ORS 109.070, including subsection (5), in context with the remaining provisions of the Act of 1957 and in the light of the previously existing statutes limiting the rights of illegitimate children, we find nothing that demonstrates a legislative intent to require that the term "other provision(s) of law" by which paternity may be established was intended to be limited to provisions which included specific limitations upon the establishment of paternity relating to the *manner of proof* by which paternity could be established, either for purposes of inheritance or for any other purpose. The fact that specific limitations were included in ORS 109.110 to 109.230 (providing for filiation proceedings) does not of itself require such a result. Indeed, since such provisions were

---

[29] See Oregon Laws 1957, ch 411, § 7. See, however, Wadsworth v. Brigham, 125 Or 428, 259 P 299, 266 P 875 (1928), as discussed below.

separately and specifically referred to in subsection (4) and since subsection (5) refers to *other* provision(s) of law" by which paternity may be established, any reasonable inference of legislative intent would appear to be the contrary.

It is also to be noted that ORS 111.230 (providing that when paternity of an illegitimate child was established by filiation proceedings not later than three years after birth of the child and while the father was alive, such a child might inherit from him), was repealed by the Act of 1957.[24] Instead, that Act provided by section 3 (ORS 111.231) that before rights dependent upon paternity could be given effect, "heirship must be established prior to the closing of the administration of the decedent's estate or, if the decedent's estate is not administered in this or any other state, then within three years after the decedent's death."

Under defendants' interpretation of the Act of 1957, defendants concede that no matter how clear the proof may be an illegitimate child cannot establish paternity at any time after death of the father, regardless of how soon after the birth of the child and even if death occurred before filiation proceedings could be filed (except for written acknowledgment of paternity, as provided in 1969 by ORS 112.105, or, perhaps, by subsequent marriage of the parents).[25] Indeed, defendants are forced to that position in view of their contention that the legal proceeding by which an illegitimate child can establish paternity is by filiation proceedings (unless there has been a written acknowledgment or a subsequent marriage of the parents).

[24] Oregon Laws 1957, ch 411, § 7.

[25] See ORS 111.220, repealed by Oregon Laws 1957, ch 411, § 7.

It is difficult to believe that the legislature in adopting the Act of 1957 intended such a harsh result, in view of the stated purpose of the Act of 1957 that children born out of wedlock shall have the same "legal status and legal relationships and * * * rights * * *" as children born in wedlock.[26] In addition, such a result is inconsistent, in our opinion, with the provisions of section 3 (ORS 111.231) under which ORS 111.230 was repealed and it was provided that heirship, for purposes of the Act, may be established up to three years after death of the father if his estate is not administered.

This, in our view, is a further reason to support the conclusion that by ORS 109.070 the legislature did not intend to confine illegitimate children to proof of paternity by filiation proceedings, but that by ORS 109.070 (5) it was intended that paternity might also be established by "*other* provision(s) of law."

It is true that in 1969 it was provided by ORS 112.105 (replacing ORS 111.231) that paternity must be established during the lifetime of the child (except for written acknowledgment of paternity signed during the lifetime of the child). Nevertheless, such a provision is still inconsistent with defendants' position, in our best judgment.

Defendants concede that the effect of their contentions is that although a child born out of wedlock is made "socially legitimate" by the Act of 1957, such a child still cannot inherit from its natural father unless the fact of paternity has first been established either by filiation proceedings, by written acknowledgment of paternity (after 1969), or by subsequent marriage

---

[26] Oregon Laws, 1957, ch 411, § 1, ORS 109.060.

of the parents. We cannot agree that the Act of 1957 was intended to have such limited effect.[20]

Thus, we come back to the question whether statutory provisions for declaratory judgment or for determination of heirship are "provision(s) of law" by

[20] Defendants also refer to ORS 112.105 (2), adopted in 1969 as a part of the new Probate Code, which amended section 3 of the Act of 1957, the remainder of which was also re-adopted as part of the Probate Code. ORS 112.105 (2) provides:

"(2) For all purposes of intestate succession and for those purposes only, before the relationship of father and child and other relationships dependent upon the establishment of paternity shall be given effect under subsection (1) of this section:

"(a) The paternity of the child shall have been established under ORS 109.070 during the lifetime of the child or;

"(b) The father shall have acknowledged himself to be the father in writing signed by him during the lifetime of the child."

Defendants contend that if the legislature had previously intended in 1957 that paternity could be established by proceedings for declaratory judgment or to determine heirship there would have been no reason for adding written acknowledgment of paternity as an additional method by which the paternity of an illegitimate child may be established—and one specifying the kind of evidence required for that purpose.

However, the purpose of ORS 112.105 is explained by the following excerpt from the minutes of the Senate Judiciary Committee on April 7, 1969, as follows:

"In reply to a question by Senator Fadeley, Mr. Zollinger explained that the section applied to two situations: One in which the father died intestate survived by a child and the question was whether the child was entitled to take upon his intestate death. If the father recognized the existence of the relationship in writing during the lifetime of the child, the child could claim. The other situation was one in which the child died and the father claimed as his heir. In that situation the section said the father could not claim unless he had, during the life of the child, established paternity or acknowledged himself to be the father in writing."

In view of this explanation, we find no inconsistency between the adoption in 1969 of ORS 112.105, as a part of the new Probate Code, and the intention of the legislature in 1957, by the adoption of ORS 109.060 et seq, "to modernize the law relating to children of unmarried parents," as that Act is construed by this court.

which paternity may be "established or declared," as held by the trial court and by the Court of Appeals in this case.

(d) *The Declaratory Judgment Act as a "provision of law" to establish paternity.*

The Uniform Declaratory Judgment Act, adopted in Oregon in 1927 (ORS 28.010 et seq) is a "provision of law," conferring jurisdiction upon Oregon courts of record "power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed."[28] ORS 28.040 provides that any person interested as an heir in the estate of a decedent may have "a declaration of rights or legal relations in respect thereto: (a) To ascertain * * * heirs, next of kin * * *" ORS 28.120 provides that the purpose of the statute is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations, and is to be liberally construed and administered."

It is of interest to note that perhaps the first declaratory judgment act was the Legitimacy Declaration Act of 1858, a statute which was adopted to enable the courts of England to make declarations of legitimacy, the validity of marriage and the right to be deemed a natural-born subject.[29] Since then, according to Borchard, Declaratory Judgments, p 138, "in the field of status, we have long been familiar with actions for * * * formal determination of family relationships."[30]

---

[28] Oregon Laws 1927, ch 300, § 1.

[29] Zamir, The Declaratory Judgment 10.

[30] See also Anderson, Actions for Declaratory Judgments 649, § 278, and Bancroft, *supra* note 13 at 546-8, § 1207.

More specifically, courts not only in England,[40] but also in the United States,[41] have been held to have jurisdiction under the provisions of declaratory judgment acts to determine and declare the paternity of children born out of wedlock.

The Act of 1957 (ORS 109.070) specifically provides that "the paternity of a person may be established as follows: * * * (5) By paternity being established *or declared* by other provision of law." We believe that the use of the term "declared" was more than mere coincidence and hold that the Declaratory Judgment Act of Oregon (ORS 28.010 et seq) is a "provision of law" by which "the paternity of a person" may be "established or declared," within the meaning of section 2 of the Act of 1957 (ORS 109.070).

(e) *Proceedings to determine heirship as a "provision of law" to establish paternity.*

ORS 117.510 is a further "provision of law," also enacted prior to the Act of 1957, and providing that "In all estates being administered in this state, * * * where any person claiming to be an heir * * * shall request such action, the court shall * * * order that the question of heirship * * * be determined."[42] Subsequent provisions set forth the procedure to be followed in filing a petition for that purpose and in

---

[40] Beresford v. Attorney General (1918), Prob 33, 87 LJ Prob NX 40, 118 LTNS 133, 34 Times L Rev 100, 62 Sol J 103.

[41] Miller v. Currie, 208 Wis 199, 242 NW 570, 572 (1932); Carlson v. Bartels, 143 Neb 680, 10 NW2d 671, 675 (1943); Maiden v. Maiden, (Oh Com Pl) 153 NE2d 460 (1955); State ex rel Anonymous v. Murphy (Mo App) 354 SW2d 42, 43 (1962). See also Schatkin, Disputed Paternity Proceedings (4th ed) 459 and 12 Anderson, Actions for Declaratory Judgment (2d ed) 1468, § 643.

[42] Oregon Laws 1913, ch 331, § 1ff.

determining the question of heirship in such a proceeding.[29]

In the case of *In re Wainolas Estate*, 79 Ariz 342, 289 P2d 692 (1955), the issue of paternity was determined by a proceeding to determine heirship under a somewhat similar statute, although the proceedings were brought by other heirs, rather than by or on behalf of the illegitimate child, and no direct ruling was made upon the appropriateness of such a proceeding to determine that issue. Courts of other states have also sustained findings on the issue of paternity in proceedings for the determination of heirship.[30]

Similarly, in *Wadsworth v. Brigham*, 125 Or 428, 259 P 299, 266 P 875 (1928), a proceeding in probate was filed by a plaintiff who claimed to be the child and sole heir of a decedent who had never married the mother of the child. Upon establishing that her parents had cohabited in Oregon as husband and wife for over one year, under the terms of Oregon Laws 1925, ch 269 (later repealed by Oregon Laws 1929, ch 149), the child was held to be entitled to inherit the estate. In making that determination it was necessary for the court to consider the sufficiency of the evidence upon the question whether plaintiff was the daughter of the decedent; whether the decedent cohabited with plaintiff's mother as husband and wife for over one year (as required by the statute) and whether plaintiff was born as the result of that illicit relationship (see 125 Or at 434).

---

[29] ORS 117.520 to 117.560, inclusive.

[30] In re Glick's Estate, 136 Mont 176, 346 P2d 987 (1959); and Van Cline v. Cline, Admx, (Ind App) 165 NE2d 608 (1960). See also In re Stone's Estate, 78 Id 632, 308 P2d 597 (1957). And see Schultz v. First National Bank of Portland, 220 Or 350, 355-6, 348 P2d 22 (1959).

It is also of interest to note that in *Wadsworth*, as in this case, defendant contended that the Act of 1925 must be narrowly construed—in that case to require proof of a common law marriage. In rejecting that contention it was held by this court, at pp 443-4:

> "* * * This statute is a radical departure from the common-law idea, as a child born out of wedlock was regarded with a cruelty which would not be a credit to modern jurisprudence. * * * We take it that this statute was enacted chiefly for the protection of such unfortunate children from the consequences of the sins of their parents rather than for the protection of the parents themselves from the consequences of their own misdoings. * * *"

and, at p 463:

> "The primary purpose of the act was to legitimatize ill-begotten children, and the provision that the parents should be considered married if the children were living as a result of the relations mentioned in the statute was merely incidental to this great purpose. The purpose of the act was not to restore common-law marriages in Oregon, but to legitimatize the children begotten of illicit relations, provided the parents lived together for a sufficient length of time to avoid any presumption that the claim of the child might not be well founded."[40]

---

[40] The court also held, at p 481:

"* * * It must be remembered that the legislature could legitimatize bastard children without any marriage of their parents whatsoever, and it would seem an absurd, unjust and uncalled for construction to put on this statute that the parents must make an actual agreement as to their relations, and that if they failed to do so the legislative act does not work and the children are still bastards."

and at p 484:

"The statute in question has been treated by the defendants

See also *In re Rowe's Estate,* 172 Or 293, 141 P2d 832 (1943), and *In re Gregoire's Estate,* 156 Or 111, 64 P2d 1328 (1937).

It is true that in 1929 the legislature of Oregon repealed the Act of 1925, which was the subject of the decision of this court in *Wadsworth v. Brigham, supra.* Nevertheless, we view our decision in that case as holding that the paternity of illegitimate children may properly be decided in probate proceedings, depending upon the nature and extent of the rights of inheritance conferred by the legislature upon illegitimate children.

We also note again that section 3 of the Act of 1957 specifically provided that:

"In applying the laws of descent and distribution of this state, full effect shall be given to all relationships as described in section 1 of this Act. Before the relationship of father and child and other relationships dependent upon the establishment of paternity shall be given effect in determining inheritance rights, *heirship must be established prior to the closing of the administration* of the decedent's estate, * * *."[68]

Reading together, as we must, these provisions of section 3 of the Act of 1957 with the provisions of

---

as though the most important matter was to legitimate an irregular union of man and woman; but this is merely secondary to the great object, that of removing the stain of bastardy from innocent offspring. These are the real sufferers which the statute wisely seeks to aid, and as to them it should be liberally construed not only in their behalf, but as a warning to the lustful that they cannot live and cohabit with a weak woman, beget children by her and hold her out as a wife so long as her charms last, and when these have faded, to repudiate these relations and leave her and the innocent offspring helpless to bear the opprobrium of bastardy."

[68] Oregon Laws 1957, ch 411, § 3 (ORS 111.231), subsequently replaced by Oregon Laws 1969, ch 591, § 28 (ORS 112.105).

section 1 of that Act (ORS 109.060, providing that the legal status and rights between a person and his parents are the same for all persons, whether or not the parents have been married), and section 2 (ORS 109.070, providing that the paternity of a person may be established not only by filiation proceedings, but also "by paternity being established or declared by other provision of law"), we are unable to reach any reasonable conclusion other than that the provisions of law for determination of heirship under ORS 117.510 et seq are "other provision(s) of law" by which paternity may be established within the meaning of ORS 109.070.

We recognize that defendants would make a distinction between determination of heirship and determination of paternity and would have us hold that an illegitimate child must first establish paternity before he is permitted to file proceedings to determine that he is the heir of his deceased father. As in *Wadsworth v. Brigham, supra,* however, we hold that in view of the broad terms and liberal purposes of the Act of 1957, as well as for all of the other reasons stated above, we are unable to find any basis for the contention that in enacting that statute the legislature intended to make any such distinction. On the contrary, we find that in referring to the establishment of "heirship" the intent of the legislature must have been to include the establishment of "paternity" as an incident of "heirship."[39]

---

[39] This result is also consistent with modern legislative trends under which the rights of illegitimate children have been expanded for other purposes.

For example, in 1965 the Social Security Act (which had previously required reference to intestate succession laws) was amended to provide for payments to the illegitimate children of

Plaintiff also contends that wholly aside from the Act of 1957, to deny to plaintiff, as an illegitimate child, the same right to inherit from its natural father as though the child was born in wedlock, would be a violation of its constitutional rights to equal protection of the laws and to due process of law, as required by the Fourteenth Amendment of the Constitution of the United States. That contention is also vigorously opposed by defendants. In view of the provisions of the Act of 1957, however, and our interpretation of such provisions, it is not necessary to consider that question.[39]

For all of these reasons, we affirm the decision of the trial court and the Court of Appeals.

Affirmed.

---

insured fathers upon "satisfactory" proof of paternity and actual dependency. (Social Security Act, 42 USC § 416(h)(3) (1965)). Illegitimates are also entitled to recover under the Veterans' Benefits Act, 38 USC § 101(4) (1964), when there is satisfactory proof of paternity.

In addition, in a number of different situations, federal courts have allowed illegitimate children to receive federal life insurance benefits payable to "children," despite the existence of state intestacy laws which would exclude such children from sharing the estate of the deceased. Metropolitan Life Insurance Company v. Thompson, 368 F2d 791 (3rd Cir 1966); Middleton v. Luckenbach Steamship Co., 70 F2d 326 (2d Cir), cert den 293 US 577 (1934); Huber v. Baltimore and Ohio Railroad Company, 241 F Supp 646, 650 (D Md 1965); Hammond v. Pennsylvania Railroad Co., 31 NJ 244, 156 A2d 689 (1959).

Another development is that at its meeting in Dallas in 1969, the National Conference of Commissioners on Uniform State Laws approved the Uniform Probate Code, which gives the illegitimate child inheritance rights equal to that of legitimate children, with paternity to be established either "by an adjudication before the death of the father" or "thereafter by clear and convincing proof." (See § 2-109, Uniform Probate Code, 1969.) See also Krause, Bringing the Bastard Into the Great Society—A Proposed Uniform Act on Legitimacy, 44 Tex L Rev 829 (1966).

[39] That question is now pending decision by the Supreme Court of the United States in the case of Labine v. Vincent (October term, 1970, No. 5257).